IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DEBRA-ANN WELLMAN, )
)
Plaintiff, )
)
v. )     Civil Action No. 05-280-SLR
)
THE DOW CHEMICAL COMPANY, )
)
Defendant. )
)

**REDACTED
PART II
TO
APPENDIX TO DEFENDANT'S OPENING BRIEF
IN SUPPORT OF ITS MOTION TO DISMISS**

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Barry M. Willoughby, Esquire (Bar I.D. 1016)
Teresa A. Cheek, Esquire (Bar I.D. 2657)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6666
Facsimile: (302) 576-3345
Attorneys for Defendant, The Dow Chemical Company

Date: June 26, 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DEBRA-ANN WELLMAN (PRO SE),  )
                             )
            Plaintiff,        )
                             )
    v.                       ) Civil Action No. 05-280-SLR
                             )
THE DOW CHEMICAL COMPANY,    )
                             )
            Defendant.        )

### AFFIDAVIT OF KAREN R. CRONIN

1.    I, Karen R. Cronin, am employed by DuPont Performance Elastomers, LLC ("DPE") as a Human Resources Consultant. DuPont Performance Elastomers is the successor to DuPont Dow Elastomers, LLC ("DDE") a joint venture between E.I. DuPont de Nemours & Company ("DuPont") and the Dow Chemical Company ("Dow").

2.    DuPont Dow Elastomers, LLC changed its named to DuPont Performance Elastomers, LLC effective July 1, 2005 following DuPont's purchase of Dow's interest in DuPont Dow Elastomers, LLC.

3.    This affidavit is submitted in support of Defendant Dow's Motion to Dismiss Plaintiff's complaint in the above matter because she was never employed by the Dow Chemical Company. In addition, at the time of the events about which she complains in her complaint, she was employed by DDE. Each of the individuals she identifies in her charge of discrimination as engaging in discrimination or harassment were employees of DDE, not Dow or DuPont.

4.    DDE was formed on April 1, 1996 by DuPont and Dow as a limited liability company under Delaware law. A copy of the Certificate of Formation of DuPont Dow

Elastomers, LLC is attached hereto as Exhibit A. DuPont and Dow each had a fifty percent interest.

     5.      At the formation of DDE on April 1, 1996, the company employed its own employees, had its own Human Resources Department, was responsible for its own labor relations, had its own separate offices, buildings, plants, facilities, and produced its own products. Attached hereto as Exhibit B is Section 13 of the Formation Agreement for DDE that sets forth its Human Resources philosophy.

     6.      At the time of their employment by DDE, employees of Dow or DuPont were required to resign or retire from employment with their parent company and became solely employed by DuPont Dow Elastomers, LLC. The Formation Agreement for DDE, among other things, specifically provided that employees of DDE should expect to spend their careers with DDE.

     7.      Plaintiff, Debra-Ann Wellman, was employed by DuPont before accepting an offer of employment with DDE effective April 1, 1996.

     8.      Ms. Wellman's charge of discrimination (Exhibit "C") identifies several individuals she contends were "Dow employees" at the time she was employed at DDE and at the times when she alleges misconduct occurred. Ms. Wellman's statement is without any factual basis.

     9.      Ms. Wellman's charge states that Paul R. Graves was a Dow employee at the time the alleged discrimination occurred. A search of DDE's human resource and payroll records

shows that Mr. Graves was employed by DDE from April 1, 1996 through June 30, 2005. He is now employed by DuPont Performance Elastomers, LLC, DDE's successor.

10.    Ms. Wellman also identifies Steve Metaxas as a "Dow employee". This allegation is also inaccurate. A search of DDE's employment records shows that Mr. Metaxas was employed by DDE from November 1, 1996 through June 30, 2005. He is now employed by DuPont Performance Elastomers, LLC, DDE's successor.

11.    Ms. Wellman also identifies me as "unknown whether a Dow or DuPont employee". At the time referred to in the charge December 7, 2001, I was a DDE employee. I have been a DDE employee from November 8, 1999 through June 30, 2005 when DDE charged its name to DuPont Performance Elastomers, LLC. I am now employed by DuPont Performance Elastomers, LLC, the successor to DDE.

12.    In paragraph 14 of her complaint, Ms. Wellman identifies Rick Bond as a "Dow employee". This statement is also inaccurate. A search of DDE's employment records shows that Mr. Bond became a DDE employee on April 1, 1996 through June 30, 2005. As of July 1, 2005 Mr. Bond is a DuPont Performance Elastomers, LLC employee.

13.    In addition, each of the individuals referred to in Ms. Wellman's complaint as being a DuPont employee were in fact DDE employees.

14.    Attached hereto as Exhibit D are copies of Ms. Wellman's W-2 forms for the years 1996 through 2002 when she was employed by DDE. Ms. Wellman's W-2 forms confirm that she was employed by DuPont prior to her accepting an offer of  full time employment with DDE in 1996.

3

15.    From the time that Ms. Wellman was employed at DDE, she was always supervised and directed by DDE supervisors and managers, not employees of DuPont nor of Dow.

16.    Attached hereto as Exhibit E is a copy of the letter dated August 26, 2002 terminating Ms. Wellman's employment at DDE for job abandonment.  That letter is on DDE stationery and is signed by a DDE representative.

_____
KAREN R. CRONIN

SWORN TO AND SUBSCRIBED before me this _3rd_ day of ~~March~~ *April*, 2006.

_____
Notary Public

April Harpster
My Commission Expires
December 22, 2009

# EXHIBIT A

*State of Delaware*                     PAGE   1

*Office of the Secretary of State*

I, EDWARD J. FREEL, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT

COPY OF THE CERTIFICATE OF LIMITED LIABILITY COMPANY OF "DUPONT

DOW ELASTOMERS L.L.C.", FILED IN THIS OFFICE ON THE SIXTEENTH

DAY OF JANUARY, A.D. 1996, AT 12:30 O'CLOCK P.M.

*Edward J. Freel, Secretary of State*

2564121   8100                          AUTHENTICATION:        7791702

960012618                               DATE:
                                                              01-17-96

CONFIDENTIAL

A19

CERTIFICATE OF FORMATION

OF

DUPONT DOW ELASTOMERS L L.C.

This Certificate of Formation of DuPont Dow Elastomers L L.C. (the "Company") is being executed by the undersigned for the purpose of forming a limited liability company pursuant to the Delaware Limited Liability Company Act.

(a) The name of the Company is DuPont Dow Elastomers L. L C.

(b) The address of the registered office of the Company in Delaware is 1209 Orange Street, Wilmington, Delaware 19801. The Company's registered agent at that address is The Corporation Trust Company.

(c) The Company may dissolve upon the Bankruptcy of a Member or upon the mutual agreement of the Members

(d) The supervisory management of the Company is vested in Member Representatives. However, no Member Representative acting individually shall be the agent of the Company or shall have authority to bind the Company, and no debt shall be contracted or liability incurred by or on behalf of the Company, except by the Member Representatives acting collectively as provided in the Company's Limited Liability Company Agreement, as the same may be amended from time to time, or by one or more officers of the Company acting pursuant to the authority granted them under such Agreement or by the Members Committee

IN WITNESS WHEREOF, the undersigned, an authorized person of the Company, has caused this Certificate of Formation, which shall become effective on 16 January, 1996, to be duly executed as of the ___16th___ day of January, 1996

Authorized Person    PRESIDENT DESIGNATE

CONFIDENTIAL

# EXHIBIT B

ARTICLE XIII

HUMAN RESOURCES MATTERS

Section 13.01.    <u>Human Resources Philosophy.</u>    Dow and DuPont recognize that the success of the Venture will depend largely on the quality of the employees that they will transfer to the Venture and the careful selection of persons to fill key positions. Dow and DuPont will endeavor to balance the selection of persons for key positions equally between Dow and DuPont employees, recognizing that these persons must have the capability to establish a new entrepreneurial culture for the Venture. The DD Elastomers management team shall be responsible for filling other management positions in DD Elastomers and the Venture.

Dow and DuPont anticipate that most of the personnel presently involved in the Dow Elastomer Business or the DuPont Elastomer Business will become employees of the Venture. The parties, however, recognize that there may be overlaps or that it may be more efficient to have employees in certain functions remain with their current employers and provide services to the Venture on a contract basis. Dow and DuPont will work together to identify these overlaps and efficiencies prior to Closing, with a bias toward (a) having the optimum number of employees become employed by the Venture and (b) ensuring that Venture management has control over those services or functions that are unique to the Combined Elastomer Business. Dow and DuPont shall be responsible for any of their respective employees who provide services to the Venture on a contract basis in accordance with Section 13.06.

D000145



A22

Section 13.02.    Transfer of Employees to the Venture.    (a)    Except as provided in Section 8.13, the Venture shall offer employment effective as of the Closing Date to substantially all of the following persons ("Elastomer Employees"):

      (i)    Employees of Dow and its Affiliates principally dedicated to the design, development, manufacture, marketing, distribution and sale of Dow Products in the Dow Elastomers Business; and

      (ii)    Employees of DuPont and its Affiliates principally dedicated to the design, development, manufacture, marketing, distribution, and sale of DuPont Products in the DuPont Elastomers Business.

Dow and DuPont will use their best efforts to cause such Elastomer Employees to accept such employment, and shall provide the Venture with information as to the title and current compensation levels of such employees and assist the Venture in effecting the change of employment in an orderly fashion.

      (b)    The offers of employment to the Elastomer Employees shall include compensation and benefits substantially equivalent in the aggregate to the DuPont Plans or Dow Plans in which they participated immediately prior to the Closing Date. Dow and DuPont shall be responsible for the salary and benefits of their respective Transferred Employees for the period up to and including the Closing Date; the Venture shall be responsible for the salary and benefits of the Transferred Employees after the Closing Date; provided, however, that Dow and DuPont in accordance with the respective terms and conditions of their variable compensation plans will select certain Transferred Employees and be responsible for a proportional share of the 1996 variable compensation award. Such shares shall be determined by multiplying the award by a fraction, the numerator of which shall be


CONFIDENTIAL

A23

the number of months of employment in 1996 with Dow or DuPont, as applicable, and the denominator of which shall be twelve. Transferred Employees selected for an award will receive the prorated award when each of Dow and DuPont pays all other awards under their respective variable compensation plans.

(c)    Dow and DuPont recognize that it may be necessary from time to time to provide employees to the Venture on a non-permanent basis. This practice, however, will be on an exception basis; Venture employees should expect to make their careers within the Venture and not transfer back to Dow or DuPont. Dow and DuPont will not offer employment to Venture employees without first consulting with Venture management.

Section 13.03.    <u>Credit for Prior Service</u>.    The Venture shall recognize the past service of the Transferred Employees with Dow or DuPont under the respective benefit plans and where applicable, their respective Affiliates on and prior to the Closing Date for the purposes of eligibility, vesting and benefit accrual in the comparable employee benefit plans, programs or policies adopted by the Venture; provided, however, that credit for accrual in qualified pension plans will be subject to the transfer of assets from the qualified plans of Dow or DuPont to the corresponding qualified plans of the Venture. Transferred Employees who retire under the Dow or DuPont qualified pension plan will receive service credit only for the purpose of vesting and limited eligibility.

Section 13.04.    <u>Establishment of Pension, Benefit and Other Programs</u>.

(a)    Effective as of the Closing Date, the Venture shall adopt the DuPont Plans listed in Schedule 13.04 and DuPont shall allow the Venture to participate in the DuPont Plans until such time as the Venture establishes other



plans and programs; provided, however, Transferred Employees of Dow, on a site-by-site basis, may continue in the Dow medical and dental plans until December 31, 1996. DD Elastomers shall withhold applicable premiums for the Transferred Employees of Dow who continue in the Dow medical and dental plans and reimburse Dow for the cost of such benefits for such employees. Dow and DuPont will work with Venture management to develop plans and programs that are competitive and consistent with industry standards and that facilitate the development of a unique culture for the Venture, and in accordance with applicable law. Effective as of the Closing Date, the Venture shall adopt a defined benefit Pension Plan ("Venture Pension Plan") qualified under Section 401(a) of the Code substantially comparable in all material respects to DuPont's Pension and Retirement Plan, except as necessary to preserve accrued benefits of Transferred Employees from Dow, and shall take any action necessary or appropriate to participate in the DuPont Master Trust and to appoint the DuPont Vice-President Pension Fund Investment as the named fiduciary of the Venture Pension Plan.

        (b)    Upon retirement from the Venture, an employee will receive post-retirement benefit coverage in effect at the time of their retirement (medical, dental and life insurance), subject to the rights of Dow, DuPont, or the Venture to amend, modify, or terminate any of their respective post-retirement benefit coverage at any time. The Venture and either Dow or DuPont will be responsible for their proportional share of any medical and life insurance benefits paid based on the employee's service. DuPont will be responsible for its proportionate share of any dental benefits paid based on the employee's service but Dow will not be responsible for its share of dental benefits.

        (i)    Dow and DuPont shall reimburse the Venture for its proportionate share of any benefits paid under a post-

KJ/Project Mayflower Confidential
March 8, 1996

-136-

D000148

Rev 9/D
FINAL

CONFIDENTIAL

A25

retirement benefit plan on behalf of a Transferred Employee who has not elected to retire under the Dow or DuPont retirement plan or his or her survivor. Such proportionate reimbursement shall be in an amount equal to the DuPont actual claims cost or the Dow "average cost" of medical benefits for a retiree (and dependents) or a survivor (and dependents), multiplied by a fraction equal to the employee's service with either Dow or DuPont divided by career service. The reimbursement for benefits shall be the lesser of the cost under the plan of Dow or DuPont or the Venture's plan, taking into account any applicable reduction factors or service schedule (the "Retiree Reimbursement Formula"). The Venture will incur the additional cost of any plan amendments or any changes in benefit plans which affect the expected allocation of the cost to the Venture. Dow and DuPont will assist the Venture in adopting a mutually agreeable procedure for administering reimbursement under this paragraph.

(ii)    An employee who retires from either Dow or DuPont shall receive benefits from the Venture while an active employee of the Venture. Upon retirement from the Venture, the participant may choose to receive coverage from the Venture's plan or the plan of Dow or DuPont. Service at the Venture will not be credited to service accrued at DuPont for retiree medical purposes.



A26

However, service accrued at the Venture will be credited to service accrued at Dow for purposes of the retiree medical support schedule, provided that the Venture reimburses Dow for the proportional cost of such benefits according to the Retiree Reimbursement Formula. If the Venture provides post-retirement coverage, then Dow or DuPont shall reimburse the Venture a proportional share, based on service, of the cost of the participant's benefits according to the Retiree Reimbursement Formula. The Venture will incur the additional cost of any plan amendments or any changes in benefit plans which affect the expected allocation of the cost to the Venture.

(iii)    The parties shall draft a series of examples illustrating this Section 13 04 as guidance for the plan administrators.

Section 13.05.    Transfer of Pension and Other Assets.    (a)    After the receipt of an opinion of counsel stating that the Venture's Pension Plan is qualified under Section 401(a) of the Code and that the trust established under the Venture's Pension Plan is exempt from taxation under Section 501(a) of the Code or after the expiration of thirty (30) days waiting prescribed by Section 6058(a) of the Code, whichever is later, Dow and DuPont will cause the trustees of their respective pension plans to transfer to the Venture Pension Plan an amount in cash equal to the Projected Benefit Obligation ("PBO") under the Venture's Pension Plan of the Transferred Employees as of the Closing Date who do not retire prior to the Closing Date using all of the funding assumptions disclosed on the Schedule B attachment to the 1994 Form 5500 for Title I of the DuPont Pension and Retirement Plan except that

KJ/Project Mayflower Confidential
March 8, 1996

-138-

D000150

Rev 9/D
FINAL



A27

the discount rate shall be 8.5% and the mortality table shall be the 1983 Group Annuity Mortality Table for healthy males and females, set back six years for females. Dow will cause its Trustee to transfer an amount to assure that at the assumed dates of termination of employment (consistent with the assumptions set forth in the 1994 Form 5500 for the DuPont Pension and Retirement Plan), sufficient assets are transferred to provide for the payment of the accrued benefit under the Dow Employees' Pension Plan as of the Closing Date. Interest at such rate from the Closing Date to the date of the transfer shall be included in the transfer amount.

In no event will the PBO of the Transferred Employees be less than the amount necessary to satisfy Section 414(l) of the Code. For the purpose of Section 414(l), the liabilities shall be calculated on a termination basis and shall be determined to equal the ABO using a discount rate determined using a bond immunization strategy similar to the strategy used by DuPont in determining its FAS 87 discount rate for pensions. All other assumptions for the purpose of 414(l) are the funding assumptions based on the 1994 Schedule B Form 5500 for Title 1 of the DuPont Pension and Retirement Plan.

If a Transferred Employee is terminated for lack of work during 1996 or 1997 for any reason other than the disposition of the business, then Dow and DuPont shall pay the Venture the value of the post-termination ABO less the value of the amount transferred pursuant to the first paragraph of this Section 13.05(a) determined as of the Closing Date. The ABO shall be determined as of the Transferred Employee's date of termination. Interest will accrue on such differential to the date of payment using the interest rate used to discount the obligations. If the amount to be paid is a negative value, then it shall be paid by the Venture to Dow and DuPont. The amount shall be determined at the end of the two-year period. For

D000151



CONFIDENTIAL

A28

this purpose, any amounts owed shall be determined in accordance with the actuarial assumptions and protocol described above.

(b)    To the extent permitted by law, the DuPont Savings and Investment Plan will accept a direct rollover within the meaning of Section 401(a)(31) of the Code from The Dow Chemical Company Salaried Employees' Savings Plan and a transfer of promissory notes or other document evidencing loans to Transferred Employees.

(c)    As soon as practicable following the Closing Date, Dow and DuPont will transfer to the Venture promissory notes or other documents evidencing housing purchase assistance loans, loan guarantees, equity advances, equity loans, advances for closing and new hire loans of Transferred Employees, as listed in Schedule 13.05(c). Upon the transfer of such notes, the Venture shall assume such loans and pay Dow and DuPont for the outstanding principal of the loans at the Closing Date.

Section 13.06    <u>Leased or Temporary Employees.</u>    (a)    The employees listed in Schedule 13.06 shall provide services to or on behalf of the Venture in accordance with a seconding agreement between the Venture and Dow or DuPont and their respective Affiliates, as applicable. Thereafter, the employee shall return to his or her respective employer; absent agreement to the contrary, the Venture shall have no further obligation to any such employee.

(b)    The Venture may establish a policy with Dow and DuPont after the Closing to allow movement of personnel between Dow or DuPont and their respective Affiliates and the Venture and to encourage the most qualified persons to work for the Venture. The parties to any such arrangement specifically will agree on



CONFIDENTIAL

A29

the terms and conditions of any such employment. The Members Committee shall approve the movement of personnel between the Venture and Dow or DuPont.

(c)    Dow and DuPont and their respective Affiliates may lease certain employees to the Venture for a period after the Closing Date and from time to time thereafter. Any such leased employees shall remain employees of their respective employers and shall provide services to the Venture in accordance with a seconding agreement between the Venture and the employer.

Section 13 07    Relocation.    Certain Transferred Employees may need to relocate physically in order to perform their employment responsibilities for the Venture. The Venture shall develop a policy to cover the relocation costs of Transferred Employees whose travel to their principal place of work would increase more than thirty (30) miles due to the formation of the Venture. The Venture shall bear the costs of any and all such relocations.

Section 13.08    Severance.    If any Elastomer Employee does not accept the employment offer from the Venture, then the employer of the Elastomer Employee immediately prior to the Closing Date shall remain responsible for such Elastomer Employee, including any severance payments. Each prior employer shall be responsible for any severance payments mandated by law as a result of transferring employees to the Venture.

Section 13 09.    Vacation.    Dow and DuPont shall permit Transferred Employees to request either a cash-out of the unused portion of their 1996 vacation entitlement which accrued up to the Closing Date or a transfer of the unused 1996 vacation entitlement to the Venture. Upon payment to the Venture by Dow and



DuPont of the amount equal to the unused 1996 vacation liability attributable to the Transferred Employees who elected to transfer their unused vacation liability to the Venture, the Venture shall assume the liability for such vacation.

Section 13.10.    Foreign Benefit Plans.    Separate agreement will be entered into covering compensation, benefits, and severance payments to employees employed by foreign Affiliates of DuPont or Dow which shall be in conformance with applicable local laws and the principles set forth above. Any bias toward adopting the benefit programs of a prior employer shall be based on simplicity and the relative number of employees covered by the plans.

Section 13.11.    Offers of Employment in Europe.    (a)    Dow and DuPont agree that the transfer of the Dow Elastomer Business and the DuPont Elastomer Business, insofar as such transfers are effected by Affiliates of Dow and DuPont, as appropriate, within any of the Member States of the European Union, constitute relevant transfers under the Directive, or under any enactment thereof in such of the Member States as the Directive is applicable.

(b)    Notwithstanding the other provisions of this Article XIII and of the Directive, the Venture has, or shall have prior to Closing, offered to all Elastomer Employees to whom the provisions of the Directive apply, employment on terms and conditions, including pension benefits, which the parties believe to be no less favorable to those applicable to their employment by the relevant Affiliate of Dow or DuPont, as appropriate.

Section 13.12.    Future Transferred Employees.    In the event that the employees at the Dedicated Facilities located on the Beaumont, Texas Integrated

CONFIDENTIAL

A31

Site, or other large groups of employees of Dow or DuPont, become a part of the Venture, separate agreements will be entered into with respect to such Elastomer Employees, with the intent that such employees shall be treated as Transferred Employees consistent with the principles set forth above.

## ARTICLE XIV
## NON-COMPETITION; FUTURE DEVELOPMENTS

Section 14.01.    <u>Competition with Venture.</u>    (a)    Except as otherwise specifically provided in this Agreement, or in the Dow Technology License Agreement or the DuPont Technology License Agreement, and for as long as Dow and DuPont each own, directly or indirectly, fifty percent (50%) of DD Elastomers, Dow and DuPont shall not, and shall cause their respective Affiliates not to, compete with the Venture within the scope of the Business Purpose.

(b)    Neither Dow or its Affiliates nor DuPont or its Affiliates shall enter into any activity within the Business Purpose for the period of five (5) years from the sale of all of its Venture Interest  The provisions of this Section 14.01(b) shall not apply in the event of a dissolution of the Venture.

Section 14.02.    <u>Improvements and New Developments.</u>    Dow and DuPont and their respective Affiliates shall provide Improvements and New Developments to the Venture pursuant to the terms of the Dow Technology License Agreement or the DuPont Technology License Agreement, as applicable.  The Venture shall offer to Dow and DuPont Improvements and New Developments



# EXHIBIT C

Oct-22-03  11:34am  From-EEOC LEGAL                           T-071  P 002/007  F-005

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| **CHARGE OF DISCRIMINATION** | ☐ FEPA | **AMENDMENT** |
| | ☒ EEOC | **170A201952** |

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

**DDOL Labor Law Enforcement Section** _State or local Agency, if any_                    and EEOC

| NAME *(Indicate Mr. Ms. Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Ms. Debra-Ann Wellman | (302) 575-1565 |

| STREET ADDRESS   CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|
| P.O. Box 4395, Greenville, DE 19807 | 11/13/1951 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| DuPont Dow Elastomers Joint Venture | Cat D (501 +) | |

| STREET ADDRESS   CITY, STATE AND ZIP CODE | COUNTY |
|---|---|
| 300 Bellevue Parkway, Suite 300, Wilmington, DE 19898 | 003 |

| TELEPHONE NUMBER *(Include Area Code)* |
|---|

| NAME | |
|---|---|

| STREET ADDRESS   CITY, STATE AND ZIP CODE | COUNTY |
|---|---|

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))* | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN | EARLIEST          LATEST |
| ☒ RETALIATION   ☐ AGE   ☒ DISABILITY   ☐ OTHER *(Specify)* | 07/01/2001   08/26/2002 |
| | ☐ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

I have been employed by the DuPont Company since 1986 as an Administrative Assistant. In or around 1996, Dow Chemical Company and DuPont Company established a Joint Venture called DuPont Dow Elastomers – Joint Venture. Upon establishing the Joint Venture, it was my understanding that each company would maintain the employment records of its own employees who volunteered to work for Joint Venture. It was further my understanding that an employee who volunteered for a position with the Joint Venture could always return to his/her parent company (the company from which he/she came). From the beginning of my employment with the Joint Venture, the supervisors and managers were employed by Dow and most of my co-workers were DuPont employees. I began working for the Joint Venture and from that time until February 9, 2002, I received no unsatisfactory performance evaluation and, in fact, was promoted one full level and went to work for the Sales and Marketing Team at Delaware Technology Park as an Administrative Assistant/Office Manager. From in or around July 2001 until February 11, 2002, when I was forced to go out on disability, I was subjected to periodic sexual harassment, a degrading environment, subjected to unwelcome sexual advances from my supervisors and harassment based on my sex, including the following incidents:

1) In or around the first week of July 2001, I received a telephone call from a manager from DuPont telling me to "watch out you have Mr.

**×× Text is Continued on Attached Sheet(s) ××**

| I want this charge filed with both the EEOC and the State or local Agency, if any I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *(When necessary for State and Local Requirements)* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief |
| I declare under penalty of perjury that the foregoing is true and correct | SIGNATURE OF COMPLAINANT |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Month, day and year)* |
| _[signature]_          Charging Party *(Signature)* | |
| Date | |

EEOC FORM 5 (Rev. 07/99)

A34

Oct  2 16:46 2002  CP Initials _____  Chg # 170A201952, Attachment Page 1
AMENDMENT

Equal Employment Opportunity Commission
Form 5 - Charge of Discrimination, Additional Text

Sensitivity (Paul R. Graves, Dow employee) and Medusa (Mary Ann Price, DuPont employee)...because they are known trouble makers." Mr. Graves shook my hand so hard that I called out "Ouch, you are going to break the bones in my hand." He said, "Oh so you're Deb, I should have known."

2) On July 20, 2001, I was ordered by Mr. Graves and Ms. Price that I go out to lunch to celebrate Nesha MacMurdo's(DuPont employee) missed birthday. I indicated that I would normally cover the phone. Mr. Graves said, "Get your cell phone and go now!" Mr. Graves started asking me personal questions such as: "How many people are in your family? How many brothers and sisters do you have? Did your mother work? Where did your father work? Are your parents alive? Did they stay married? Were you ever married before? Are you dating? What do you do for entertainment? Where do your brothers and sister live? What are their professions? How many children do they have? Are you close to your nieces and nephews? How long have you work for DuPont? What departments at DuPont have you worked in? I finally said now wait a minute I thought this was a celebration for Nesha and you have been doing nothing but batting out the questions to me about my personal life. Why don't you ask the other's questions?" Mr. Graves glared at me and said, "I didn't know I was making you uncomfortable." I said, "You are not making me uncomfortable, but you're really firing out questions to me alone and not interacting with the rest of your luncheon guests, and I think you should give them a chance to answer some of your near and dear to the heart questions."

3) On July 30, 2001, I was told by Mr. Graves not to lock any of my cabinets or desk. I was the only employee asked to keep my desk, cabinets and filing cabinets open at all times, although this was not "site security rules".

4) On August 3, 2001 - Mr. Graves scheduled a meeting in his office with me on a one-on-one basis. Mr. Graves slammed the door very hard and walked behind his desk to look at his computer screen, and look through papers. I sat in a guess chair around the table in his room. Mr. Graves took a phone call and turned around to look at me while he was talking to caller stating, "I know what to do, she will understand when I am done with her. No, I am not afraid to do this. Thanks for the call, I will speak with you later." Mr. Graves walked around the table and sat down at the opposite side of the table from me. I handed him my job description to Mr. Graves and said, "Here is a copy of my job account abilities/responsibilities, and most of the duties that I perform here at Kalrez." Mr. Graves threw the papers back at me and said "I don't care what you do here." Mr. Graves then answered his cell phone and was

Oct  2 16:46 2002  CP Initials _L.D.W_  Chg # 170A201952, Attachment Page 2

AMENDMENT

staring/glaring at me very hard and stating to the caller. "Yes it is started and I did not have a chance to ask those questions yet. "Okay, call me back." Mr. Graves then states, "I understand that there are people here at Kalrez that talk about people, and I understand you are one of them. I know you are a gossip." I stated, "What are you talking about? I do not know what you mean. Please be more specific." Mr. Graves said, "If I ever hear you talking about anyone. I will knock you back so hard that you will not know what hit you." I said, "That is a threat Sir, and why are you speaking to me this way." Mr. Graves stated, "Because I can."

5) On August 13,2001, I am in my office and Mr. Graves comes in and asks that I show him something in the Kalrez Literature Room. Mr. Graves states, "I want you to straighten it up in here. Tell me what all of this stuff is in here. I state, "In the back area here these binders, books, videos, documents, etc. are the Kalrez Applications Engineer's items. Mr. Graves states, "Well I want to move these binders f rom here to here." Here to here meant f rom a lower shelf to a much higher shelf. I said "Okay, I can do that, but not today." Mr. Graves said "Why" I said, "I am not dressed to move those items to that higher area in the Literature Room    today. I will do this an Friday. Mr. Graves states, "No, I can help you move them today." And he now moves the Kalrez Library Ladder toward me and extends his arm for me to climb up the 3 steps.   I could see Mr. Graves looking up my dress and smiling at me. I was wearing a blouse, skirt and pumps that day. I move about six (6) binders and said I had to go do something back in my office and I would move the rest of the binders later. Mr. Graves stated, "If you need anymore help just let me know," Mr. Graves was rocking back and forth and smiling from ear to ear. I left the room very disgusted.

6) On August 23, 2001 - Mr. Graves comes into my office to talk about distributor contracts. Mr. Graves never sits in my guess chair, but stands at the filing cabinet and looms over me. He has  a pen in his hand and is talking and waving it back and forth and it finally come out of his hand and goes under my desk. I have to crawl on my hands and knees under the desk because it has gone toward the back of the desk. His pen continues to come out of his hand four (4) more times. I am crawling under the desk each time to retrieve.  Mr. Graves never looks at me when he talks to me just stares at my chest. I pick up the pen for the fourth time and hand it to him and he is now laughing/snickering. I said, "What is so   funny?" Mr. Graves states, " I am enjoying this." I ask him to put the pen down and ask his questions and Mr. Graves says, "That's okay, I'm done." And he leaves my office.

7) On September 26, 2001, I am in the kitchen are in the morning and Mr. Graves comes into this area. I am pouring my coffee in my cup and I now feel him behind me touching me with his body. Mr. Graves states "Here I need mine filled up." I pour the coffee, and leave the kitchen area, very disgusted.

Oct  2 16:46 2002  CP Initials _K.D.M_  Chg # 170A201952, Attachment Page 3
AMENDMENT

8) On November 2, 2001, it was Friday and normally I am dressed down,
but I had a dinner to go to after work, so I was dressed in a dress and
pumps. Mr. Graves stated that he was not busy at the time and he could
help me move the boxes now. I said okay, and get the library ladder and
started to pick up the boxes to hand to him and he said, "No you go up
on the ladder." I knew what he was doing with looking up my dress again,
and I told him that men have more upper arm strength to lift heavy items
over their head, and would he mind standing on the ladder. Mr. Graves
demanded that I climb the ladder while he stood below me and made the
following statements: "Now that wasn't that bad was it? You need to
lighten up, Deb. You are too uptight. You'll never get what you want if
you don't give a little. I guess I've lost my opportunity to be with
you, haven't I? You do not know how much you turn me on. Oh that's right
you only date men from DuPont." I did not say one word, since any past
interaction with Mr. Graves always-turned into anger and aggression by
Mr. Graves.

9) On December 7, 2001 - Mr. Graves comes into my office and starts
asking me questions about, when I had Steve Metaxas(Dow employee) and
Karen Cronin(unknown whether a Dow or DuPont employee) review my job for
re-leveling. I explained that Karen Cronin come back and stated that my
job is leveled properly. Then Steve Metaxas came to me and told me the
very same thing and also expressed that I should not have gone to Human
Resources(HR) to have this request done. I should have come to him.
Mr. Graves states, "I am in agreement with Steve. I do not think you
do a good enough job here to warrant a re-leveling." The entire time he
is rocking his groin area back and forth asking me "Do you understand be
Deb, you are not yet ready for a promotion?" I said "You know Paul,
Steve Metaxas did the exact same thing to me when he told me I was not
ready for a promotion yet, and did I understand what he meant also. I
said, "Well, I get it loud and clear from both of you, and I am not
stooping to that to get a promotion from you or anyone else." Mr.
Graves states, "It would make it a lot simpler, Deb, do you understand?"
I said, "Get out of my office now and I mean it."

10) On December 13, 2001, Mr. Graves comes up behind me in the
Literature Room and rubs himself against me. I jump to the side and move
away and look at him right in the eye and say, "Hey what are your
doing?" Mr. Graves just smiles and leaves the room.

11) On January 3, 2002, I arrive in Mr. Graves' office to have my DOC he
cancels the meeting, because he said he did not receive the document
that I sent to him. I said, "I sent them to you via e-mail. And you knew
I came back from Holiday vacation early to have this meeting with you."
Mr. Graves states, "Well, isn't that a shame, now reschedule the meeting
with Mary Ann. You wouldn't have wanted to have your DOC with me prior
to your Christmas Holiday anyway, because you would have been very
depressed. Make it for a few weeks from now. I told you to cooperate
Deb, didn't I? When will you learn?" Mr. Graves stood up and was
adjusting his trousers, grossly tucking in shirt in his pant, and

Oct  2 16:46 2002  OP Initials _Glan_  Chg # 170A201952, Attachment Page 4
AMENDMENT

shaking his belt area and looking at his crotch and looking back at me.
I exit Mr. Graves' office. The gross action of adjusting the pants and
grabbing the belt area, and the groin movements were a Steve Metaxas
tactics also.

12) On January 16, 2002, I was called into Mr. Graves' thinking that I
was going to go over my DOC and all he could do was rant and rave about
who I knew at DuPont and that there was nothing I could do to improve.
I am becoming very upset and scared, because the atmosphere is horrible
and unprofessional. I asked "Why are you doing this to me?" Mr. Graves
stated, "Because I can. I am the boss and just sit there and stop
interrupting me." I am now slowly pushing my chair back to get away
from him, because I am really scared of his cruel behavior. As soon as
he sees me moving back he jumps up and puts his right arm and grabs the
opposite side of the chair and jerks it very hard and his arm is now
across my chest area and he is pressing very hard, and I am pushing my
chair back and he continues to rub his arm across my chest and this went
on for a few minutes. Until I moved his fore arm up and put both my
hands over my chest and said "Now wait a minute you have gone well over
the line and get your arm off my breasts." Mr. Graves just smiled in my
face and came even closer to me and I pulled my head away. I stood up
quickly to move my chair back totally away from him. Mr. Graves stood up
very quickly and jammed his nose in my left ear and said, "I knew what
you were the first time I saw you." I said, "And what was that?" Mr.
Graves said, "I know what you are, you're a spy for DuPont."

13) On February 4, 2002, Mr. Graves comes into my office and asks me
about signing my DOC. I said, "I will not sign that document." Mr.
Graves starts to walk out of my office and says "You will never learn
will you Deb? Do what I tell you to do." I do not respond to Mr. Graves.

14) On February 7, 2002, Mr. Graves walks in to my office and states,
"I was just talking to Rick Bond(Dow employee) about your job and we are
canceling the Kalrez Incentive Trip, and we don't feel we have a place
here for you at Kalrez." I said, "Paul, the Incentive Trip is just a
third of my job, what do you mean you do not have a place for me at
Kalrez, there is plenty of work here to do.' I do not say any more,
because I know I am going to EAP at DuPont to report this situation.
Michael Sherman(DuPont employee) calls me and states, "How are you
doing?" I respond "Okay." Michael says, "Just okay?" I said, "Yes, just
okay." Michael Sherman then says, "Well, I called to tell you that I am
probably pulling you from your job, on Monday (February 11, 2002) you
will call out sick on Monday morning and we will remove the victim from
your boss. I said, "Okay is this normal procedure? Because I have never
used the EAP system before." Michael Sherman states "Well, you don't
want to stick your hand back in the meat grinder again do you?' I said,
"No."

15) On February 11, 2002, I was forced to leave my position and go on

Oct-22-03   11:36am   From-EEOC LEGAI   'T                                    T-071   P 007/007   F-005

Oct   2 16:46 2002   CP Initials _i. G,ni_   Chg # 170A201952, Attachment Page 5

AMENDMENT

disability.

16) On August 26, 2002, I was discharged.

I believe that I have been discriminated against by being sexually
harassed, given a poor evaluation, subjected to unwelcome advances,
forced to work in a hostile environment, harassed, forced to leave my
position on disability and retaliated against by being discharged all
because of my sex(female) and disability, in violation of Title VII of
the Civil Rights Act of 1964, as amended and Title I of the Americans
with Disabilities Act of 1990, as amended.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DEBRA-ANN WELLMAN,      )
                   )
        Plaintiff,      )
                   )
      v.            )     Civil Action No. 05-280-SLR
                   )
THE DOW CHEMICAL COMPANY,      )
                   )
        Defendant.      )
                   )

**EXHIBIT D TO**
**APPENDIX TO DEFENDANT'S OPENING BRIEF**
**IN SUPPORT OF ITS MOTION TO DISMISS**

# ENTIRETY OF DOCUMENT (A41-A42) CONFIDENTIAL

YOUNG CONAWAY STARGATT & TAYLOR, LLP

  /s/ Barry M. Willoughby           
Barry M. Willoughby, Esquire (Bar I.D. 1016)
Teresa A. Cheek, Esquire (Bar I.D. 2657)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6666
Facsimile: (302) 576-3345
Attorneys for Defendant, The Dow Chemical Company

Date: June 26, 2006

# EXHIBIT E

DuPont Dow Elastomers LLC
300 Bellevue Parkway
Wilmington DE 19809



## DuPont Dow elastomers



August 26, 2002

Ms  Debra-Ann Wellman
5 Twaddell Mill Road
Wilmington, DE  19807-1223

Dear Deb.

As a result of your failure to respond to our requests for verification of your continued disability and your failure to return to work, we are terminating your employment for job abandonment effective immediately

In determining that you have chosen to abandon your job, we note that:
- you removed your personal effects from your office in February, 2002;
- an additional week of paid disability leave was provided to allow you more time to consult with your attorney concerning your options;
- during the pre-return to work meeting with the Employee Assistance Counselor and Human Resources Director on Tuesday, August 13, 2002, you confirmed your understanding of the options available to you and that the situation required immediate resolution.  You were asked to appear for a return to work meeting scheduled for Friday, August 16, 2002 or you were to provide the Company with your desire to pursue an incapability pension (details including a pension calculation were provided to your attorney on July 19, 2002);
- in a fax from you received Friday, August 16, 2002, you stated you would make a decision on or before August 23, 2002;
- an additional week was provided after the conclusion of your paid disability leave to allow you time to, again, consult with your attorney concerning your options;
- you failed to appear for a return to work meeting on Friday, August 23, 2002 nor did you ask the Company to apply for an incapability pension on your behalf;
- your therapist has informed the Employee Assistance Counselor that you cancelled your most recent session;
- you have stopped making yourself available to the Employee Assistance Counselor;
- in a voice message left for the Employee Assistance Counselor on Saturday, August 24, 2002, you stated your unwillingness to return to work; and
- you failed to appear for a return to work meeting on Monday, August 26, 2002

D117

A44

Debra-Ann Wellman
August 26, 2002
Page 2 of 2

You are asked to reconcile your American Express account within 30 days so that you receive all monies owed to you by the Company and DuPont Dow receives any reimbursements from you for personal expenses already paid by the Company

You are also asked to return any company property, including computer, cell phone and/or any other tangible property that you have in your possession.  You may make arrangements to do so by contacting me on 302 792.4211   If you have any remaining personal items in your office, you also make arrangements with me to obtain those items

Within two weeks, you will receive information from DuPont Connection concerning your benefits including options for continuing your medical coverage under COBRA.  Any accrued or banked vacation not taken as of today will be paid to you

Deb, you are reminded that the proprietary information agreement you signed upon your employment with the Company remains in effect after termination  You are required to return all confidential information and all trade secret material you have obtained during your employment with DuPont Dow Elastomers and you are not to use or to divulge at any time any secret or confidential information of DuPont Dow Elastomers, without DuPont Dow Elastomers' consent

Sincerely,

Karen R  Cronin
HR Consultant

D118

A45

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2006, I electronically filed a true and correct copy of the

foregoing **REDACTED Appendix to Defendant's Opening Brief In Support Of Its Motion To**

**Dismiss** with the Clerk of the Court using CM/ECF, which will send notification that such filing is

available for viewing and downloading to the following counsel of record:

> John M. Stull, Esquire
> 1300 North Market Street, Suite 700
> P.O. Box 1947
> Wilmington, DE 19899
>
> YOUNG CONAWAY STARGATT & TAYLOR, LLP
>
>  /s/ Barry M. Willoughby
> Barry M. Willoughby, Esquire (No. 1016)
> Teresa A. Cheek, Esquire (No. 2657)
> The Brandywine Building
> 1000 West Street, 17th Floor
> P.O. Box 391
> Wilmington, DE 19899-0391
> Telephone: (302) 571-6666; (302) 571-6676
> Facsimile: (302) 571-3345; (302) 576-3286
> Email: bwilloughby@ycst.com; tcheek@ycst.com
> Attorneys for Defendant

Dated:   June 26, 2006